## IN THE UNITED STATES DISTRICT COURT
## FOR
## THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **YUDELKA REYNOSO, ROMAN WACH** and **JENNIFER AHMAD**, on behalf of themselves and all other Class Members similarly situated,<br><br>**Plaintiffs,**<br><br>v.<br><br>**NEW JERSEY TURNPIKE AUTHORITY**, a New Jersey Body Corporate and Politic, as agent for **NJ E-ZPass**, as agent in the state of New Jersey on behalf of the Electronic Toll Collection Consortium which includes the New Jersey Turnpike Authority, the South Jersey Turnpike Authority, the Delaware River Port Authority, the Delaware River and Bay Authority, the Delaware River Joint Toll Bridge Commission, and the Burlington County Bridge Commission; **JOSEPH W. MROZEK**, in his capacity as an individual and in his capacity as the Executive Director of the New Jersey Turnpike Authority; **VERONIQUE HAKIM**, in her individual capacity and in her former capacity as the Executive Director of the New Jersey Turnpike Authority; **DONNA MANUELLI**, in her individual capacity and in her capacity as Chief Financial Officer (formerly as Comptroller) of the New Jersey Turnpike Authority, **ABC Corporations 1-50**, a fictitious name | : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : | **CLASS ACTION COMPLAINT**<br><br>**Civ. Action No. _____**<br><br>JURY TRIAL DEMANDED |

| | |
|---|---|
| intended to identify any corporate entities or business associations defendants as yet known; **Jane and John Does 1-50** in their individual and official capacities, | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| **Defendants**. | : |
| | : |

# TABLE OF CONTENTS

I. INTRODUCTION AND SUMMARY OF THE ACTION.................................... 4

II. JURISDICTION & VENUE ........................................................................ 6

III. PARTIES................................................................................................. 7

IV. CLASS ACTION ALLEGATIONS ................................................................ 12

V. FACTS GIVING RISE TO THE CAUSES OF ACTION................................. 16

    A.The NJ E-Z Pass System.............................................................. 16

    B.Legislative Authority for Enforcement of Unpaid Toll Violations and the Imposition of Administrative Fees Attending Collection ............................ 18

    C.The Declining Costs of NJ E-Z Pass' Toll Violation Collections................ 20

    D. The Tragic Irony – the Actual Costs of Toll Violation Collection Go Down but the Administrative Fee Charged to Motorists increases One Hundred Percent........................................................................................... 26

VI. CLAIMS FOR RELIEF ............................................................................. 41

## CLASS ACTION COMPLAINT

Plaintiffs Yudelka Reynoso, Roman Wach, and Jennifer Ahmad ("Plaintiffs"), by and through their undersigned counsel, on behalf of themselves and all other persons similarly situated, allege the following facts and claims upon knowledge as to matters relating to themselves and upon information and belief as to all other matters and, by way of this Complaint, aver as follows:

## I.
## INTRODUCTION AND SUMMARY OF THE ACTION

1.      This is an action to thwart a most offensive abuse of power perpetrated by the New Jersey Turnpike Authority ("NJTA" or the "Authority") and to recover charges which it has illegally assessed against millions of individual New Jersey Turnpike and Garden State Parkway (collectively, the "Turnpike") motorists (the "Individual Motorists") through its manipulation of the E-Z Pass toll payment system.

2.      Each of the Individual Motorists has been unlawfully charged, and has each been forced to pay, an exorbitant administrative fee (the "Administrative Fee" and collectively, the "Administrative Fees") of $50 for what were, by in large, inadvertent failures to pay Turnpike tolls.

3.      What is more, each of the Individual Motorists has been sent an Advisory and Payment Request, which include threats to take legal action against

them which have no basis in law and which do not include Congressionally mandated disclosures concerning the collection of consumer debts, all in contravention of the Fair Debt Collection Practices Act and the Excessive Fines Clause of the VIII Amendment to the United States Constitution.

4.     As alleged in specific detail below, NJTA is without legal authority to assess the Administrative Fees at such a high rate but has nevertheless brazenly persisted in doing so, for the past six (6) years and counting.

5.     On the contrary, these Administrative Fees were clearly intended by the Legislature to cover only the *actual* costs incurred by NJTA in processing and collecting outstanding tolls, not as a profit reaping vehicle for the Authority.

6.     The law is crystal clear that the Administrative Fee may not be used to generate additional revenues for the Authority – nor should it be used as a fine to punish motorists.

7.     Despite these clear restrictions the fee was suddenly doubled from $25 to $50 in October of 2011, without any cogent justification for doing so.

8.     The Authority claimed that the drastic increase was needed to cover the rising costs of enforcement.

9.     This was a lie, and NJTA knew it – a mere rouse offered after the fact to prop up the legitimacy of its extortionate money grab.

10.     The reality is the costs of enforcement have declined significantly since E-Z Pass' inception in New Jersey in 1996.

11.     Indeed, for the past six years, NJTA has engaged in a pattern of surreptitious conduct, glossing over a series of falsehoods, faulty economic analyses and accounting methodologies, waste, inefficiency, and plain old incompetence, to cover up what can only be characterized as a massive theft and a most egregious breach of the public trust, which has resulted in hundreds of millions of dollars in ill gotten gains.  It stops now.

12.     Accordingly, this Complaint arises from, *inter alia*, Defendant's violation of the excessive fines clause of the VIII Amendment to the U.S. Constitution and the reasonableness threshold explicitly articulated in N.J.S.A § 27:23 *et seq.* .

13.     This action seeks redress for all Individual Motorists that where illegally charged, and who paid, collectively, nearly $200,000,000 to the NJTA from 2011 through the present day – damages that continue to increase at the rate of at least $85,000 per day.

## II.
## JURISDICTION & VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 (federal question) based on its implications of the laws of the United States

and violations of the United States Constitution.   The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.   Venue is appropriate in the District of New Jersey because a majority of the events complained of occurred in this District and because at least one class representative is resident here.

16.   This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. Sections 1332(d), 1453, and 1711–1715 (Class Action Fairness Act) because the aggregate amount in controversy exceeds $5 million; the class comprises at least 100 Plaintiffs; and at least one Plaintiff class member is diverse from at least one of the Defendants.

### III.
### PARTIES
*Plaintiffs*

16.   Plaintiff Yudelka Reynoso ("Ms. Reynoso") is an adult citizen and resident of the Commonwealth of Pennsylvania who received a First Advisory and Payment Request for a claimed toll violation on April 24, 2017 of $5.15.   A true and correct copy of the First Reynoso Request is attached hereto and incorporated herein as Exhibit A.

17.   In addition to the request for the unpaid $5.15 toll, an Administrative Fee of $50 was added to the notice for a total amount due of $55.15.

18.     Ms. Reynoso received a Second Advisory and Payment Request on April 25, 2017 of $3.00. A true and correct copy of the Second Reynoso Request is attached hereto and incorporated herein as Exhibit B.

19.     In addition to the request for the unpaid $3.00 toll, an Administrative Fee of $50 was added to the notice for a total amount due of $53.

20.     She then received a Third Advisory and Payment Request on April 25, 2017 of $1.50. A true and correct copy of the Third Reynoso Request is attached hereto and incorporated herein as Exhibit C .

21.     In addition to the request for the unpaid $1.50 toll, an Administrative Fee of $50 was added to the notice for a total amount due of $51.50.

22.     Ultimately Ms. Reynoso paid the total outstanding toll charges of $9.65, in addition to the $150.00 in Administrative Fees for a total of $159.65.

23.     Plaintiff Roman Wach is an adult citizen and resident of the State of Maryland who received a First Advisory and Payment Request for a claimed toll violation that occurred on March 21, 2017 for $.75. A true and correct copy of the Wach Request is attached hereto and incorporated herein as Exhibit D .

24.     In addition to the request for the unpaid $.75 an Administrative Fee of $50 was added for a total amount due of $50.75.

25.     Mr. Wach paid the $50.75 on or about May 5, 2017.

26.     Jennifer Ahmad ("Ms. Ahmad") is an adult citizen and resident of the State of New Jersey who received a First Advisory and Payment Request for a claimed toll violation on February 1, 2017 of $0.50.

27.     In addition to the request for the unpaid $0.50 toll, an Administrative Fee of $50 was added to the notice for a total amount due of $50.50.

28.     Ms. Ahmad received a Second Advisory and Payment Request on February 8, 2017 of $1.50.

29.     In addition to the request for the unpaid $0.50 toll, an Administrative Fee of $50 was added to the notice for a total amount due of $51.50.

30.     Ultimately Ms. Ahmad paid the total outstanding toll charges of $2.00, in addition to the $100.00 in Administrative Fees for a total of $102.00.

*Defendants*

31.     Defendant NJTA was, at all relevant times, a New Jersey body policitc and corporate whose principal office at 581 Main Street, Woodbridge, N.J. 07095.

32.     NJTA has the capacity to sue and be sued in its own name pursuant to N.J.S.A. § 27:23-5.

33.     Upon information and belief Defendant NJ E-Z Pass was New Jersey body politic and corporate who principal office is locate at 375 McCarter

Highway, Newark, NJ 07114.

34.     Upon information and belief, at all relevant times, Defendant NJTA acted as agent for or otherwise on behalf of Defendant NJ E-Z Pass, as representative in the State of New Jersey for the Electronic Toll Collection Consortium (which includes: (1) NJTA; (2) the South Jersey Transportation Authority ("SJTA"); (3) the Delaware River Port Authority ("DRPA"); (4) the Delaware River and Bay Authority ("DRBA"); (5) the Delaware River Joint Toll Bridge Commission ("DRJTBC"); and (6) the Burlington County Bridge Commission ("BCBC") for the enforcement of toll violations and the collection of the Administrative Fees.

35.     Upon information and belief, Defendant Joseph W. Mrozek ("Mrozek") is an adult individual and resident of the State of New Jersey.

36.     From March 2014 until present, Mrozek was employed as the Executive Director of NJTA and is responsible for the overall integrity of the Authority's toll violation collection processes and compliance with N.J.S.A §27:23 *et seq.*

37.     Upon information and belief, Defendant Veronique Hakim ("Hakim") is an adult individual and resident of the State of New York.

38.     Hakim is presently the Interim Managing Director of the New York

City Metropolitan Transit Authority, but was employed as the Executive of the Authority from 2010 until Mrozek assumed the position in 2014.

39. During her tenure as Executive Director, Hakim was responsible for the overall integrity of the Authority's toll violation collection processes and compliance with N.J.S.A § 27:23 *et seq.*

40. Upon information and belief, Defendant Donna Manuelli ("Manuelli") is an adult individual and resident of the State of New Jersey.

41. At all times relevant to this Complaint, Manuelli was employed by NJTA as the Comptroller and later as the Chief Financial Officer, and was integrally involved in preparing and reviewing budgets and other financial analyses related to the E-Z Pass toll violation collections processes and advising on the Authority's policies attending those processes.

42. Upon information and belief, there are additional corporate defendants necessary to the just adjudication of this action, the precise identities of which are presently unknown to Plaintiffs and are thus pled as ABC Corporations 1-50.

43. Upon information and belief, there are additional individual defendants necessary to the just adjudication of this action, the precise identities of which are presently unknown to Plaintiffs and are thus pled as Jane and John Does 1-50.

## IV.
## CLASS ACTION ALLEGATIONS

44.    Plaintiffs bring this class action on behalf of themselves and as a class action under Federal Rule of Civil Procedure 23 on behalf of the following Classes:

A) **THE "8TH AMENDMENT CLASS" IS COMPRISED OF ALL INDIVIDUALS WHO HAVE BEEN ASSESSED AND PAID A $50.00 ADMINISTRATIVE FEE FOR TOLL VIOLATIONS TO THE NEW JERSEY TURNPIKE AUTHORITY FROM OCTOBER 17, 2011 THROUGH THE DATE OF CLASS CERTIFICATION;**

B) **THE "FDCPA CLASS" IS COMPRISED OF ALL INDIVIDUALS WHO ENTERED INTO THE E-Z PASS AGREEMENT (AS MORE PARTICULARLY DESCRIBED BELOW) AND RECEIVED AN "ADVISORY PAYMENT REQUEST" FROM DECEMBER 1, 2016 THROUGH THE DATE OF CLASS CERTIFICATION (THE FDCPA CLASS AND THE 8TH AMENDMENT CLASS COLLECTIVELY AS THE "CLASS MEMBERS").**

45.    Excluded from the Classes are:

a) Any Judge or Magistrate presiding over this action and members of their families;

b) Defendant NJTA and any entity in which Defendant NJTA has a controlling interest or any entity which has a controlling interest in Defendant NJTA and its legal representatives, assigns and successors of Defendant NJTA; and

c) Defendants Mrozek, Hakim, and Manuelli; and

d) All persons who properly execute and file a timely request for exclusion from the Class.

46.     Numerosity: Upon information and belief, the class for whose benefit this action is brought includes millions of people and is so numerous that joinder of all members is impracticable. The exact number and identities of the persons who fit within the proposed class are contained in Defendants' records and can be easily ascertained from those records.

47.     All claims in this action arise exclusively from uniform policies and procedures of Defendant as outlined herein.

48.     No violations alleged in this complaint are a result of any individualized oral communications or individualized interaction of any kind between class members and Defendant or anyone else.

49.     Commonality: There are common questions of law and fact affecting the rights of the Class Members, including, *inter alia*, the following:

a) whether assessing a $50.00 Administrative Fee violates N.J.S.A 27:25A-21.3 *et seq.*; and

b) whether assessing a $50.00 Administrative Fee violates the VIII Amendment to the U.S. Constitution; and

c) whether sending of the Advisory and Payment Requests violates the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*; and

d) whether the Class Members are entitled to injunctive relief in the form of an order directing Defendants to send a court-approved notice to all Class Members, advising of the conduct alleged herein, as well as an order enjoining the conduct alleged herein and establishing a court-administered program to provide refunds of the overcharges to all such Class Members.

e) whether the illegal assessment of $50 Administrative renders the E-Z Pass Agreement voidable and subject to rescission.

50.    Plaintiffs are members of the class they seek to represent.

51.    The claims of Plaintiffs are not only typical of all class members, they are identical.

52.    All claims of Plaintiffs and the class arise from the same course of conduct, policy and procedures as outlined herein.

53.    All claims of Plaintiffs and the class are based on the exact same legal theories.

54.    Plaintiffs seek the same relief for themselves as for every other class member.

55.    Plaintiffs have no interest antagonistic to or in conflict with the class.

56.   Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making appropriate injunctive and declaratory relief for the class as a whole.

57.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy since, *inter alia*, the damages suffered by each class member per violation was less than $1000.00.

58.   Common questions will predominate, and there will be no unusual manageability issues.

59.   <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of the Class Members and have no interests antagonistic to those of the Class.   Plaintiffs have retained counsel experienced in the prosecution of complex class actions, including but not limited to consumer class actions.

60.   <u>Predominance and Superiority</u>: This class action is appropriate for certification because questions of law and fact common to the Class Members predominate over questions affecting only individual members, and a Class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all Class Members is impracticable.

61.   Should individual Class members be required to bring separate actions, this Court and/or courts throughout New Jersey would be confronted with

a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments.

62.     In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

## V.
## FACTS GIVING RISE TO THE CAUSES OF ACTION

### A. THE NJ E-Z PASS SYSTEM

63.     The NJ E-Z Pass system allows Individual Motorists to pay tolls electronically, rather than relying on cash and tickets, by using special equipment attached to the motorists' vehicles and by passing through specially equipped toll lanes along the Turnpike.

64.     Users of the system are required to establish a prepaid account using a credit card, personal check or cash.

65.     Once the prepaid account is established the Individual Motorist receives a small electronic tag (transponder) which attaches to the windshield of the Individual Motorist's car.

66.     Inside the transponder is a chip which contains information about the

account and the particular vehicle to which it is linked.

67.   Each time the Individual Motorist passes through an E-Z Pass toll facility an antenna at the toll plaza reads the vehicle and account information contained in the transponder.

68.   The appropriate toll is then automatically debited from the Individual Motorist's prepaid account.

69.   The contours of the consumer arrangement between the Individual Motorist and New Jersey E-Z Pass are memorialized in an E-Z Pass Agreement (the "Agreement") containing standard "Terms and Conditions."

70.   These Terms and Conditions have been revised and amended over the years of E-Z Pass' existence in New Jersey.  Representative examples of the Terms and Conditions that have typically been used since 1996, are incorporated herein and attached hereto as Exhibit E.

71.   The E-Z Pass Agreement purports to prohibit the Individual Motorist from using E-Z Pass lanes if the Individual Motorist has an insufficient balance and subjects him or her to treatment as a toll "violator." *See* Exhibit E at Para. 2i.

72.   Additionally, the Agreement purports to obligate the Individual Motorist to "pay all costs, including attorney's fees, incurred by New Jersey E-Z Pass to collect any monies due" and states that "improper use of the [transponder]

or failure to pay the proper toll may result in the imposition of an administrative fee or other charges." *Id.* at Paras. 10 and 6 respectively.

73.   As such, if the prepaid account is insufficiently funded, even by mistake – for example if the credit card linked to the account as a funding source has expired in the normal course unbeknownst to the Individual Motorist – and the Individual Motorist drives through an E-Z Pass toll lane and in turn inadvertently fails to pay the toll, they are immediately subject to a toll violation plus the $50 Administrative Fee; even where the underlying toll is for a *de minimus* amount.

74.   However, the validity of this Agreement presupposes NJTA's legal authority to impose fees and costs at specific rates consistent with applicable statutes and implementing regulations.

## B. LEGISLATIVE AUTHORITY FOR ENFORCEMENT OF UNPAID TOLL VIOLATIONS AND THE IMPOSITION OF ADMINISTRATIVE FEES ATTENDING COLLECTION

75.   The New Jersey legislature has authorized the NJTA to impose an administrative fee on toll violators, but the fee must be "***reasonable***" and "based upon the ***actual cost*** of processing and collecting ***the*** [toll] ***violation***." N.J.S.A. § 27:23-34.3 (emphasis added).

76.   Accordingly, as stated in the plain language of N.J.S.A. § 27:23-34.3, the Administrative Fee must be: (i) reasonable and (ii) specifically targeted at

recouping the cost of pursuing each individual toll violator.

77.     The legislature did not authorize NJTA to use the Administrative Fee as a profit center to generate additional general revenues on the backs of a narrow class of people who actually pay the Violations.

78.     Unfortunately, over time, this is precisely what has happened – NJTA has abused its authority under N.J.S.A. § 27:23 to exact millions upon millions of dollars from motorists using the Turnpike.

79.     The   Administrative   Fee   may   be   immediately   imposed   and communicated to an Individual Motorist in the initial advisory and payment request.  N.J.S.A. § 27:23-34.3(a); *see also* N.J.A.C. § 19:9-9.2(b).

80.     If the Individual Motorist fails to properly dispute or pay the required toll and Administrative Fee within 30 days of the advisory and payment request date, the Individual Motorist is subject to "liability" on the 31st day "pursuant to the issuance of a complaint and summons."  N.J.S.A. § 27:23-34.3(a); *see also* N.J.A.C. § 19:9-9.2(b)("owner shall be subject to penalties described herein").

81.     The "liability" contemplated by the Legislature (and the "penalties" contemplated by the Administrative Code) include fines of up to $500 and imprisonment not exceeding 30 days.  N.J.S.A.  § 27:23-34; *see also* N.J.A.C. § 19:9-9.3(a) ("A violation… shall be punishable by a fine not exceeding $500.00 or

by imprisonment not exceeding 30 days or by both such fine and imprisonment").[1]

82.     Often the advisory and payment request sent to Individual Motorists is titled "First Notice of Enforcement Action".    A true and correct copy of an example of the First Notice of Enforcement Action sent to Plaintiff Wach is attached hereto and incorporated herein as Exhibit D.

## C. THE DECLINING COSTS OF NJ E-Z PASS' TOLL VIOLATION COLLECTIONS

83.     Since the inception of the E-Z Pass system in New Jersey in 1996, NJTA contemplated the entire Turnpike toll system's administration and maintenance according to an end-to-end service solution provided by a third party vendor.

84.     This service solution has included: lane remediation services; the establishment, operation and maintenance of customer service centers ("CSC") and violation processing centers ("VPC") for the collection of the Administrative Fees; lane maintenance services; build-out services; software, hardware, and fiber optics systems, including related maintenance services; and other services that were added to the contracts over time (collectively, the "E-Z Pass Services").

85.     As such, over the years, NJTA has entered into a series of contracts

---

[1] Inexplicably NJTA's Violation Enforcement Policy outlines several civil and criminal penalties that may be enforced against motorists *that are nowhere to be found in the statute or regulation*: "[I]f drivers fail to resolve outstanding account balances or violations in a timely manner, the Authority may, in its discretion, pursue either civil remedies or criminal penalties or both.  Authority actions may include, but are not limited to, reporting debts to consumer credit rating agencies, seeking suspension or revocation of vehicle registration through the New Jersey Motor Vehicle Commission ("MVC"), and . . . vehicle impoundment"

with outside vendors for the provision of the E-Z Pass Services (the "E-Z Pass Services Contracts").

86.     These contracts are best understood along three distinct timelines: (1) the first contract which encompassed the period from 1996 to 2002 and was entered into with MFS NT, Inc. ("MFS NT") as vendor (the "MFS Contract")[2]; (2) the second contract, which included several significant amendments, encompassed the period from December 13, 2002 through July 16, 2017, the "Professional Services Agreement by and between New Jersey Turnpike Authority, New Jersey Highway Authority, South Jersey Transportation Authority and ACS State & Local Solutions, Inc. to provide Professional Services in support of New Jersey E-ZPass System Remediation, Buildout, Operations and Maintenance", as subsequently assumed from ACS State & Local Solutions, Inc. by Xerox State & Local Solutions, Inc. (the "Xerox Contract")[3], a true and correct copy of which is incorporated herein and attached hereto as Exhibit F; and (3) the third contract which has been in place from July 16, 2017 until present, again with Xerox as vendor (the "New Xerox Contract").

---

[2] The MFS Contract was ultimately terminated prematurely based on MFS' horrendous track record of performance. In July 2002 NJTA commissioned a report, "A Plan that Works for NJ: Honest and Accountable," which noted "the E-Z Pass project has been without a technically and financially stable contractor [MFS NT] from almost the first day after award. Consequently, the project has been beset by delays and technical difficulties. Repeated changes in corporate management, as well as project managers, combined with the technical inexperience of the various vendors, have significantly contributed to the problems that beset E-Z Pass even today." The Report recommended that MFS NT be replaced with ACS/Xerox.
[3] Xerox acquired ACS in 2009.

87.   The MFS Contract is of little practical relevance for present purposes since it was disastrously administered and ultimately abandoned.

88.   The first version of the Xerox Contract on the other hand, remained in place from 2002 through the end of 2010 and permitted Xerox to bill NJTA for the following mix of fees related to collecting toll violations: (1) a variable contingent fee of 35% of all toll violations collected (identified in the first iteration of the Xerox Contract as "Contractor's Advisory Payment Request ("APR") Share"); (2) an annual fixed fee to fund the VPC; and (3) several miscellaneous charges priced on a per occurrence basis, including toll posting charges, violation processing charges, accuracy validation charges, violation response charges, DMV lookup charges and in-lane speed notice charges (collectively, the "Variable Charges"). *See* Exhibit F, Appendix B at §§ 3.6, 3.7 and 4.1-4.6.

89.   Effective January 1, 2011 and continuing through the end of 2012, the Xerox Contract was renegotiated and the compensation terms were amended.

90.   Under the first amended Xerox Contract, the compensation structure was revised to entitle Xerox to: (1) a variable contingent fee of 65% of the first $16,500,000 of violations collected and 50% of all amounts collected in excess of $16.5MM; (2) an annual fixed fee to fund the VPC; and (3) a variable accuracy validation fee billed at $0.0243 per review.  *See id.* at Supplement S, "Amended and Restated Appendix B" at §§ 3.6, 3.7 and 4.1-4.6.

91.     Then, effective January 1, 2013 and continuing through the middle of July 2017, the Xerox Contract was again amended to effect another restructuring of Xerox's compensation scheme.

92.     Under the second amended Xerox Contract the compensation structure was revised to entitle Xerox to: (1) a variable contingent fee of 45% of the first $19,000,000 of violations collected and 40% all amounts collected in excess of $19MM; (2) an annual fixed fee to fund the VPC; and (3) a variable accuracy validation fee billed at $0.0252 per review. *See id.* at Supplement Y, "Second Amended and Restated Appendix B" at §§ 3.6, 3.7 and 4.1-4.6.

93.     Then, on May 29, 2015, in anticipation of the expiration of Xerox Contract, NJTA issued a request for proposal to procure a new contract for E-Z Pass Services for an initial term of eight (8) years, with the option to extend for an additional two (2) year term at NJTA's discretion.

94.     NJTA received proposals from two bidders, Xerox and TransCore, LP ("TransCore"), for a new contract set to begin February 1, 2017.

95.     Xerox was ultimately selected as the winning bidder and the New Xerox Contract was entered into commencing as of July 17, 2017[4].

---

[4] Conduent State and Local Solutions, Inc. ("Conduent"), as successor-in-interest to Xerox State and Local Solutions, Inc. and assignee of the Current E-Z Pass Contract, has been the primary contractor administering the E-Z Pass system since the new contract's February 1, 2017 start date. The "Cut-Over Date" for the 2017 E-Z Pass Contract was subsequently extended to July 17, 2017 through an amendment to the 2017 E-Z Pass Contract, but as

96.     Upon information and belief, under the New Xerox Contract, the vendor is entitled to a variable contingent fee of 18% of all toll violations collected.

97.     Since NJTA's determined to have Xerox take over the E-Z Pass toll violations system in 2002, and as a consequence of the several amendments to the Xerox Contract and the favorable terms of the New Xerox Contract, the actual costs associated with the administration of and collection of toll violations have precipitously dropped year after year.

98.     For example, by NJTA's own public disclosure in December of 2010 the *actual cost of enforcement was projected to be reduced by $37,000,000* for the years 2011-2014.

99.     NJTA attributed the dramatic reduction in costs to, among other things, a "[r]evision of the violation administrative fee payment structure" which took root with the first amended Xerox Contract:

---

detailed on page 13 of the NJTA Board Meeting Agenda from January 31, 2017 (the "1/31/17 NJTA Meeting Agenda"), *"[t]he new, lower pricing under the [Current E-Z Pass Contract]* will continue to take effect on February 1, 2017" (emphasis added).  A true and correct copy of the 1/31/17 NJTA Meeting Agenda is attached hereto as Exhibit R.

In an effort to reduce our contractual expenditures to ACS, the Authority, acting on behalf of all agencies represented in the New Jersey E-ZPass Customer Service Center, commenced discussions with ACS on modifications to the existing Agreement. Specifically, the Authority sought to reduce overall expenditures to ACS while exercising only one two-year extension option (2012-2014). Negotiations were held with ACS regarding the following two (2) issues: (1) adjusting downward the cost of the Agreement for the remainder of the existing term (January 1, 2011 – July 31, 2012); and (2) continuing to further reduce costs from existing contract levels during the first two-year option period.

Based on existing contract terms, staff estimates that contract costs for the period January 1, 2011 through July 31, 2014 – expiration date of the first two-year option period – would be $268.7M. As a result of our negotiations with ACS, these contract costs could be reduced to $231.7M, a reduction of $37M, or 13.77%. This reduction is the result of the following:

- Revision of the violation administrative fee payment structure
- Reduction in the fixed fees
- Waiver of the obligation to pay for certain items designated as "optional charges" up to a maximum of $750,000 per year subject to COLA

*See* Proceedings of New Jersey Turnpike Authority Commission Meeting, Wednesday, December 15, 2010 (the "12/15/10 NJTA Board Meeting Minutes") at pp. 41-42; a true and correct copy of the 12/15/10 NJTA Board Meeting Minutes is attached hereto as Exhibit G.

100.   Likewise, nearly six years later, violation collection costs were noted to continue along a downward trend.

101.   The NJTA Board noted that the New Xerox Contract "constitutes significant savings from the current [Xerox Contract]." *See* a true and correct copy of the "9/29/2015 NJTA Board Meeting Minutes", attached hereto and incorporated herein as Exhibit H.

**D. THE TRAGIC IRONY – THE ACTUAL COSTS OF TOLL VIOLATION COLLECTION GO DOWN BUT THE ADMINISTRATIVE FEE CHARGED TO MOTORISTS INCREASES ONE HUNDRED PERCENT**

102. Between 1998 and 2011, the Administrative Fee permitted under N.J.S.A § 27:23-34.3 was set by NJTA regulation at $25.

103. In theory then, based on the presumption that NJTA would necessarily comply with N.J.S.A. § 27:23-34.3 and act as an otherwise responsible steward of its legislative privilege, the $25 charge was both reasonable and based on the actual costs of processing and collecting individual violations.

104. The Authority's 2004 Report, "Working for New Jersey: Two Years of Progress," is consistent with this theory, in so far as it espoused the effectiveness of the then-current E-Z Pass system, including historically low violation rates and increased overall performance by the third-party vendor (ACS/Xerox), and thereby endorsed the appropriateness of a $25 Administrative Fee.

105. In spite of the continued success of the then existing system, and the plummeting costs of enforcement (as publicly admitted by NJTA in late 2010), NJTA nonetheless inexplicably doubled the Administrative Fee from $25 to $50 on October 17, 2011 – a charge which is neither reasonable nor tied to the actual cost of processing and collecting individual violations.

106. Indeed, the circumstances surrounding the doubling of the Administrative Fee are characterized by a gaping rift between what NJTA claimed was happening, and the truth.

### *NJTA's Non-Sensical Financial Analysis "Justifying" the Increased Administrative Fee*

107. On March 21, 2011, NJTA sought authorization to commence the rulemaking process under the New Jersey Administrative Procedures Act to amend the Administrative Fee from $25 - $50.

108. Throughout the regulation drafting and approval process NJTA claimed that the drastic and sudden increase was a necessary reaction to the rising costs of enforcement.

109. For example, in its March 21st memorandum seeking authorization for the fee increase (the "Memo"), NJTA stated the following, in pertinent part,

1.    **Amendment of Administrative Fee for E-ZPass Violators**

In authorizing the Authority to implement E-ZPass on its roadways, see P.L. 1997, c. 59, §6, et seq., the Legislature also permitted the Authority to impose a "reasonable administrative fee" for any violation of the Authority's E-ZPass regulations. See N.J.S.A. 27:23-34.3(e). The purpose of the administrative fee is not to generate incremental revenues for general operations or to punish violators. Rather, the fee's purpose, according to statute, is to recoup "the actual cost of processing and collecting the violation." N.J.S.A. 27:23-34.3(a). This fee need not be calculated with mathematical precision, but must be reasonable and bear a rational relationship to the actual costs of enforcement.

The administrative fee has remained unchanged at $25 since the implementation of E-ZPass in the late 1990's. A financial analysis conducted by Authority staff shows that the actual costs of enforcement have risen to $50 per violation. Staff is mindful of the need to proceed in an incremental fashion to avoid unduly penalizing motorists. But the cost of running the violations enforcement program is now being subsidized with toll revenues collected from the vast majority of the public which abides by the law. An adjustment of the administrative fee would properly allocate the enforcement costs to the narrow class of habitual or intentional toll violators.

Therefore, authorization is requested to amend N.J.A.C. 19:9-9.2(b) to increase the E-ZPass violation administrative fee to $50, effective April 1, 2011. This increase will affect only E-ZPass violators, and the Authority will continue to adjudicate cases of inadvertent violations consistent with its existing business rules.

(emphasis added).[5]  A true and correct copy of the entire Memo is attached hereto and incorporated herein as Exhibit I.

110.  Three months later, in its June 6, 2011 Notice of Proposed Rule Making (the "Notice"), NJTA reiterated its thesis that a rate increase was necessitated by the rising costs of toll violation enforcement.

111.  The Notice also offered this dire prediction: "[i]f the amendments are not adopted, the Authority's efforts to efficiently collect revenues on its roadways would be frustrated, and this would ultimately affect the Authority's statutory mandate to provide for the safe and efficient use of the New Jersey Turnpike and Garden State Parkway by those who travel on it and are situated near it. This would negatively impact the public." *See* 43 N.J.R. 1325(a).

---

[5] Incredibly, these representations were made just three months after the NJTA Board was touting a nearly $40 million reduction in toll violation collection overhead. *See supra* para. 91.

112.  Notably, in both its Memo and Notice, NJTA claimed that the $50 Administrative Fee was supported by a so-called "financial analysis" that had been conducted by its staff sometime in January of 2011.

113.  As can been seen below, the "financial analysis" which ultimately came to be relied upon was nothing more than a half page chart haphazardly purporting to sum up the cost of NJTA's toll violation collection program (the "Analysis").

114.  The Analysis, such as it is, is reproduced *in its entirety* here:

**New Jersey E-ZPass Costs to Collect Violations**
**Based on 2010 Actual Data**

| | | |
|---|---|---|
| Number of Violation Notices Collected | | 664,203 |
| 35% Contractor's Share of Admin Fees Collected (1) | 11,623,557 | |
| Image Review Tolls (6,926,923 Images) | 2,427,946 | |
| Initial APR's Issued (3,511,050) | 7,169,356 | |
| Second & Third APR's Issued (3,354,228) | 5,591,385 | |
| Accuracy Validation - Second Image Review (14,515,814) | 351,151 | |
| Responses to Violation Disputes (503,137) | 455,784 | |
| DMV Look-Up Costs | 106,604 | |
| Total Offset Charges | 27,725,784 | |
| VPC Fixed Fees | 6,039,153 | |
| Shared Fees - Accuracy Validation | 351,151 | |
| Cost of Violations to New Jersey E-Zpass | | 34,116,087 |
| Cost per violation | | $51.36 |

115.  According to this Analysis,  the actual cost of collecting NJ E-Z Pass toll violations is $51.36 per violation, which clearly weighed in support of the Authority's proposal to increase the Administrative Fee from $25 to $50.

116.   Looked at more closely, though, the Analysis critically undermines, rather than supports, the Administrative Fee increase.

117.   For starters, although the Analysis was meant to support an increased fee beginning in October of 2011, it uses outmoded data from 2010 which includes the line item expenses (highlighted in red, below) *that had already been eliminated 10 months prior* when the Xerox Contract was first amended.



**New Jersey E-ZPass Costs to Collect Violations**
**Based on 2010 Actual Data**

| | | |
|---|---|---|
| Number of Violation Notices Collected | | 664,203 |
| 35% Contractor's Share of Admin Fees Collected (1) | 11,623,557 | |
| Image Review - Tolls (6,926,923 Images) | 7,477,940 | |
| Initial APR Cashed (6,741,000) | 7,415,350 | |
| Seconds - Third APR Cashed (3,456,228) | 3,591,288 | |
| Accuracy Validations Second Image Review (14,516,814) | 4,501,131 | |
| Responses to Violation Disputes (503,137) | 4,557,768 | |
| DMV Lookup Costs | 100,500 | |
| Total Offset Charges | 27,725,784 | |
| VPC Fixed Fees | 6,039,153 | |
| Shared Fees - Accuracy Validation | 351,151 | |
| Cost of Violations to New Jersey E-Zpass | | 34,116,087 |
| | | |
| Cost per violation | | $51.36 |

(1) Assumes a $50.00 Administrative Fee applied to the actual number of violation notices collected

118.   As previously discussed, *the elimination of these expenses meant that NJTA's actual costs were being reduced by at least $37,000,000* from 2011-2014.

119.   It also ginned up the total projected costs of collecting violations by plugging in a $50 administrative fee (when, in fact, the fee had yet to be increased

to $50) to the line item of "Contractor's Share of Admin Fees Collected" (highlighted in yellow, below), which is calculated at 35% of all administrative fees actually collected by Xerox:

**New Jersey E-ZPass Costs to Collect Violations**
**Based on 2010 Actual Data**

| | |
|---|---|
| Number of Violation Notices Collected | 664,203 |
| | |
| 35% Contractor's Share of Admin Fees Collected (1) | 11,623,557 |
| Image Review Tolls (6,926,923 Images) | 2,427,946 |
| Initial APR's Issued (3,511,050) | 7,169,356 |
| Second & Third APR's Issued (3,354,228) | 5,591,385 |
| Accuracy Validation - Second Image Review (14,515,814) | 351,151 |
| Responses to Violation Disputes (503,137) | 455,784 |
| DMV Look-Up Costs | 106,604 |
| Total Offset Charges | 27,725,784 |
| VPC Fixed Fees | 6,039,153 |
| Shared Fees - Accuracy Validation | 351,151 |
| Cost of Violations to New Jersey E-Zpass | 34,116,087 |
| | |
| Cost per violation | $51.36 |

(1) Assumes a $50.00 Administrative Fee applied to the actual number of violation notices collected

120. At $25 per 664,203 violations collected the "Contractor's Share of Admin Fees Collected works out to just over $5.8 million.

121. In other words, the Analysis artificially inflated the vendor contingency fee by nearly $6,000,000.

122. Additionally, the Analysis inexplicably allocated all of the costs of pursuing the trumped up administrative fees to <u>only</u> the limited set of people who actually pay the fees, as opposed to the tens of millions of scofflaws who do not.

123. Although the Analysis does not include the total number of violations,

publically available data from 2003 and 2016 suggest that there were approximately 10,000,000 total violators in 2010.[6]

124.   Rather than divide the total amount spent trying to collect the violations by the total number of violators ($34,116,087 / 10,000,000 = **$3.41 per violation**) the Analysis divides the total collection spend by only the number of motorists that actually paid the Administrative Fee ($34,116,087 / 664,203), which of course resulted in the much higher, self-serving, per violation collection rate of $51.36.

125.   In other words, NJTA committed itself to the draconian principle that a select few must pay for the sins of many – 664,204 motorists must pick up the slack for the 8,085,796 motorists that pay nothing; a phenomenon which is, in and of itself, directly at odds with N.J.S.A. § 27:23-34.3 since the statute requires that Administrative Fee be apportioned on an individual by individual basis.

126.   A more reasonable and fairer approach (and one that is <u>not</u> in violation of the statute), as suggested above, would be to assess the costs of processing and collection equally across *all* violators not just those who actually pay the fee.

127. Finally, and perhaps most egregiously, the Analysis completely ignores the bona fide publically available evidence that NJTA consistently (if not

---

[6] The number 10,000,000 is an average of the 2003 (8,750,000) and 2016 (11,500,000) estimated figures made publically available by NJTA.

always) ran at a surplus (*i.e.* a profit) of hundreds of millions of dollars each year between 2004 and 2011, even while charging an Administrative Fee of $25.

128.   In fact, NJTA's December 1, 2011 review of its own financial condition (the "2011 Review") **revealed a surplus of $129,639,000 before the fee was increased to $50**.   A true and correct copy of the 2011 Review is attached hereto as Exhibit J.   *See* Ex. J at Schedules B (labeled "Revenue Less Requirements") and D (labeled "Excess Revenues").

129.   The truth of the matter is, the Analysis upon which the fee increase was predicated was reversed engineered to guarantee a predetermined target outcome of $50.

130.   Rather than let the actual numbers dictate the amount of a reasonable administrative fee for the cost of collection, NJTA decided on $50, which, as will be explained in greater detail below, was based on an ulterior financial objective, and then relied upon stale and misleading data to back into its preferred fee figure after the fact.

131.   This gross manipulation of the financial landscape is born out with pristine clarity in NJTA's own records.

132.   After the Board, led by Defendant Hakim, had thumped its own chest on December 15, 2010, bragging that the actual costs of enforcement were poised

to drop by nearly $40,000,000 just four (4) days later, on January 5, 2011, Defendant Manuelli provided the following directions to a key member of her staff, finance manager Lou Polise ("Polise"):

**From:** Manuelli, Donna
**Sent:** Wednesday, January 05, 2011 15:50
**To:** Polise, Lou
**Subject:** update cost of collecting violation

Lou I need you to update your cost to collect violation for 2010........hopefully it's still around 50 because we are going to increase the admin fee. I need this in the next week if possible we have to have it before we go to commssioners on January 25th. thanks

**Donna Manuelli**
**Comptroller - Revenue & Finance**
**New Jersey Turnpike Authority**
**732-750-5300 ext. 8130**

True and correct copies of internal NJTA emails related to the fee increase are collectively attached hereto as Exhibit K.

133.   Following Defendant Manuelli's directive, Polise set about cobbling together the hackneyed Analysis referenced above.

134.   Disturbingly, at the exact same time the Analysis was being prepared, Polise produced a spreadsheet which, unlike the Analysis that was ultimately relied upon for the fee increase, properly accounted for the financial incentives which resulted from the amended Xerox Contract (the "Actual Cost Analysis").

135.   The Actual Cost Analysis, listed below, demonstrated to Defendants Hakim and Manuelli that an increase in the Administrative Fee from $25 to $50 would generate more than $8,000,000 in profits to NJTA *each year*, well beyond

the revenue neutral concept underpinning N.J.S.A. § 27:23-34:

**2010 costs for Violations w/o uncollected tolls - prior to contract ammendment**

| New Jersey E-ZPass Totals | at $25 | at $40 | at $50 |
|---|---|---|---|
| 65% to Contractor of first $16.5 million Admin Fees Collected, 5( | 10,777,541 | 15,759,065 | 19,080,082 |
| Image Review Tolls (6,407,328 Images) | - | - | - |
| Initial APR's Issued (3,268,390) | - | - | - |
| Second & Third APR's Issued (3,084,243) | - | - | - |
| Accuracy Validation - Second Image Review (13,451,100) | - | - | - |
| Responses to Violation Disputes (460,349) | - | - | - |
| DMV Look-Up Costs | - | - | - |
| Total Charges by ACS | 10,777,541 | 15,759,065 | 19,080,082 |
| VPC Fixed Fees (Discount not taken) | 6,039,153 | 6,039,153 | 6,039,153 |
| Shared Fees - Accuracy Validation | - | - | - |
| Cost of Violations to New Jersey E-Zpass | 16,816,693 | 21,798,218 | 25,119,234 |
| **Violation Transaction Complete Payments** | | | |
| Total Admin Fees Collected / $25 | 664,203 | 664,203 | 664,203 |
| **Cost per violation** | 25.32 | 32.82 | 37.82 |
| | at $25 | at $40 | at $50 |
| Gross administrative fees collected* | 16,605,082 | 26,568,131 | 33,210,163 |
| less 65% to Xerox on first $16.5 mill, 50% thereafter | 10,777,541 | 15,759,065 | 19,080,082 |
| less offset amounts | - | - | - |
| less fixed fees to operate VPC | 6,039,153 | 6,039,153 | 6,039,153 |
| less shared fees | - | - | - |
| Net administrative fees received after expenses | (211,612) | 4,769,913 | 8,090,929 |

*See* Exhibit K.

136.   Despite Polise's compelling case that the $50 Administrative Fee was not justified, the increase from $25 was implemented any way.

137.   What is more, Defendants Mrozek and Manuelli have continued to endorse and permit the illegal $50 Administrative Fee from 2011 to the present even after the actual cost savings had solidified.

138.   For example, Polise confirmed, a year after the Administrative Fee increase took effect, that the actual costs associated with processing E-Z Pass violations had in fact declined significantly:

**From:** Polise, Lou
**Sent:** Wednesday, May 02, 2012 3:13 PM
**To:** Manuelli, Donna
**Subject:** RE: update cost of collecting violation

With the change to the Xerox contract, the cost of violation processing for nj ezpass is down $11,000,000 from 2010 to 2011.

**Louis Polise**
Financial Manager
Phone (732) 750-5300 x 8172
Fax (732) 750-5346

139.   Since the Analysis was completed, NJTA has avoided its obligation to regularly review the appropriateness of the Administrative Fee.

140.   Not once in the past 6 years has the Authority ever bothered to update its so-called analysis, admitting "[t]here was an analysis done when the fee was first increased. _None has been done since that time_."   Exhibit L (emphasis added).

141.   And, data from the Authority's own General Ledger proves that NJTA has reaped tens of millions of dollars in pure profit each year from 2011 through 2017 from its disingenuous doubling of the Administrative Fee.

142.   Indeed, that data proves that the actual cost associated with collecting unpaid tolls _has consistently been well under $25 per violation each year between 2011 and 2017, meaning that NJTA has made tens of millions of dollars in pure profit for each of the past six (6) years_.

143.   But why?   Why all the smoke and mirrors and reliance on poor computational methodology and faulty logic?

*NJTA's Ulterior Financial Objective – Billions Owed to the State of New Jersey*

144.   Although NJTA ostensibly sought approval for the doubling of the Administrative Fee in March of 2011 based on an alleged spike in toll violation collection costs,   the rate hike was actually driven by an ulterior financial objective.

145.   The real reason for doubling the Administrative Fee was to cover an additional $29,000,000 in yearly payments being made to the State of New Jersey out of NJTA's General Operating Fund, even though NJTA's use of the funds in this manner is prohibited under New Jersey law and despite the Authority's claim that the increased Administrative Fee was not designed "to generate incremental revenues for general operations ...."   43 N.J.R. 1325(a); *see also* "Proposed increase in E-Z Pass administrative fee Backgrounder (sic) and discussion points" circulated to New Jersey Turnpike Authority Commissioners, a true and correct copy of which is attached hereto at Exhibit M, at ¶ 4.

146.   Careful scrutiny of NJTA's overall financial condition for the past six years makes it clear that its doubling of the Administrative Fee from $25 to $50 did not go toward covering increased enforcement costs, but instead *improperly generated nearly $100,000,000 dollars in additional revenue* which was funneled to the Authority's General Operating Fund and was then paid over to the State of New Jersey.

147.   In its 2011 Financial Review, NJTA noted that the change from $25 to $50 (along with the elimination of off-peak discounts for non-NJ E-Z Pass customers) would result in $4,800,000 in additional revenue in just the last two months of 2011.  Ex. J at Schedule C.

148.   The NJTA further predicted *an additional $29,000,000* in "revenue enhancements" for 2012 alone, as a result of the increase of the Administrative Fee to $50 and the elimination of the discount.  *Id.* at Schedule F.

149.   Of the $29,000,000 in yearly revenue enhancements, approximately $16,000,000 was related to elimination of the discount and at least $13,000,000 in additional revenue flowed to NJTA every year between 2012 and the present on account of the increased $50 Administrative Fee.  *See* Proceedings of New Jersey Turnpike Authority Commission Meeting, Tuesday, May 24, 2011 (the "5/24/11 NJTA Board Meeting Minutes") at p. 22; a true and correct copy of the 5/24/11 NJTA Board Meeting Minutes is attached hereto and incorporated herein as Exhibit N.

150.   These sums were transferred to the Supplemental Capital Fund in the NJTA's General Operating Fund.  *Id.* at Schedule B, n.(2).

151.   Upon information and belief this trend of Administrative Fee profit and the  practice of transferring that profit to the Authority's General Operating has

continued uninterrupted year after year since 2012 through to the present day.

152. NJTA needed this additional money to supplement a portion of the approximately $1.5 billion it had agreed to transfer out of its General Operating Fund to the New Jersey Treasury pursuant to an agreement executed just a few days prior to the drastic Administrative Fee increase.

153. In fact, within weeks of NJTA's June 2011 announcement that it intended to raise the Administrative Fee to $50, it also requested authorization to enter into a funding agreement whereby NJTA would provide the State of New Jersey with a total of $1,527,000,000 over five years (the "Funding Agreement"). A true and correct copy of the Funding Agreement is attached hereto and incorporated herein as Exhibit O .

154. According to a memorandum dated August 25, 2011 from Defendant Manuelli to Defendant Hakim (the "8/25/11 NJTA Memo"), the Funding Agreement was needed to bankroll Governor Chris Christie's proposed new Transportation Capital Plan (the "TCP"). A true and correct copy of the 8/25/11 NJTA Memo is attached hereto as Exhibit P.

155. Per the 8/25/11 NJTA Memo, "The five-year TCP addresses vital statewide transportation projects. Funding for the TCP includes among other sources, annual cash contributions from [NJTA]." *Id.* at p.1.

156. The memo detailed  NJTA's annual financial commitment to the Treasurer of the State of New Jersey as part of the TCP and pursuant to the Funding Agreement, according to the following schedule:

| State Fiscal Year (July 1 through June 30 | NJTA Contribution |
|---|---|
| 2012 | $229 million |
| 2013 | $324 million |
| 2014 | $324 million |
| 2015 | $324 million |
| 2016 | $324 million |

157. Of the $324,000,000 committed annually to New Jersey by NJTA between 2013-2016, $295,000,000 was made up of funds already earmarked for the state along with "*an additional $29 million per year*":

The $324 million contributions are the sum of the $195 million per year the Authority had committed to remit to New Jersey Transit for cancelled ARC Tunnel, the $100 million annual payment the Authority had been making to NJDOT for feeder road capital payments, and an additional $29 million per year. For the State's Fiscal Year 2012 ("FY12"), which is from July 1, 2011 through June 30, 2012, the Authority will remit $229 million to the State. Because the Authority was scheduled to begin its ARC payments to New Jersey Transit in calendar year 2012, the Authority is projected to have about only half of the $195 million payment available for the State's FY2012. Thus, the Authority's contribution for the State's FY12 is $95 million less than the subsequent fiscal years.

*Id.* (emphasis added).

158. The same $29,000,000 was identified by NJTA as a "revenue enhancement" starting in 2012 by virtue of, in part, the doubling of the Administrative Fee. *See* Ex. J (2011 Review, at Schedule F).

159. By no sheer coincidence the NJTA Board *confirmed the final*

*rulemaking for the increased $50 Administrative Fee <u>and</u> approved the terms of the Funding Agreement* at the same September 7, 2011 Board meeting.  *See* Proceedings of New Jersey Turnpike Authority Commission Meeting, Tuesday, August 30, 2011 Rescheduled For Wednesday, September 7, 2011 (the "9/7/11 NJTA Board Meeting Minutes") at p. 8, Agenda Item 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 ($50 Administrative Fee) and p. 31, Agenda Item 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 (Funding Agreement); a true and correct copy of the 9/7/11 NJTA Board Meeting Minutes is attached hereto as Exhibit Q.

160.  Approximately one month later, on October 17, 2011, the Administrative Fee was officially increased to $50 and by December 2011, NJTA began conveniently noting that it expected to receive annual revenue enhancements of $29,000,000 in large part due to the $50 increased fee starting in 2012, incidentally the first year that the "additional $29 million" would be due under the Funding Agreement.

## VI.
## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION:
### 28 U.S.C. § 2201
### Declaration That N.J.A.C. § 19:9-9.2 Is Invalid Both on Its Face and As Applied
### (As Against Defendant NJTA on behalf of the 8th Amendment Class)

161.  Plaintiffs repeat and re-allege each and every allegation contained

above as though fully set forth herein.

162.   The New Jersey Legislature has authorized NJTA to impose an administrative fee that is "reasonable" and "based upon the actual cost of processing and collecting the [toll] violation." N.J.S.A. § 27:23-34.3.

163.   In October of 2011, NJTA violated the statute when it promulgated N.J.A.C. § 19:9-9.2 setting the Administrative Fee at $50, which fee was neither reasonable nor based upon the actual cost of processing and collecting the Violations.

164.   N.J.A.C. 19:9-9.2(b) must be set aside because the rulemaking process undertaken in 2011 that culminated in the October, 2011 amendment to N.J.A.C. 19:9-9.2(b) was procedurally defective and otherwise failed to confirm with the basic tenants of due process applying to the rulemaking and regulatory process.

165.   On its face, N.J.A.C. § 19:9-9.2 violates N.J.S.A. § 27:23-34.3 insofar as the so-called 2010 financial "analysis" offered as the sole support for the NJTA's contention that a $50 Administrative Fee is reasonable and based upon the actual processing and collection costs is built on the fundamentally flawed assumption that the Administrative Fee was $50 as of 2010, when in fact it was $25.

166.   On its face, N.J.A.C. § 19:9-9.2 violates N.J.S.A. § 27:23-34.3 insofar

as the so-called 2010 Analysis offered as the sole support for the Authority's contention that a $50 Administrative Fee purports to require the roughly 10% of the people who actually pay their toll violation notices subsidize the cost of pursuing the other 90% of people who never pay the fee.

167.   On its face, N.J.A.C. § 19:9-9.2 violates N.J.S.A. § 27:23-34.3 because the so-called 2010 Analysis offered as the sole support for the Authority's contention that a $50 Administrative Fee is reasonable and based upon the actual processing and collection costs is built on the fundamentally flawed assumption that the vendor's contingent fee share – which amounts to roughly one third of the total cost of violations – remained static from 2011 through to the present day, when in fact that share actually decreased by roughly half (from 35% to 18%) from 2011 to 2017.

168.   On its face, N.J.A.C. § 19:9-9.2 violates N.J.S.A. § 27:23-34.3 insofar as the NJTA has used and continues to use the increased Administrative Fee to generate additional surplus revenue for the agency's General Operating Fund.

169.   On its face, N.J.A.C § 19:9-9.2 violates N.J.S.A. § 27:23-34.3 insofar as the Authority has not passed on to Individual Motorists any of the approximately $37,000,000 in cost savings realized by NJTA from January 1, 2011 through July 31, 2014 due to, *inter alia*, a revision of the violation administrative fee payment structure payable to Xerox, and has instead retained those proceeds as

surplus revenue for the agency's General Operating Fund.

170.   On its face, N.J.A.C § 19:9-9.2 violates N.J.S.A. § 27:23-34.3 insofar as the Authority has not passed on to Individual Motorists any of the cost savings realized   from August 1, 2014 through to the present day due to, *inter alia*, additional revisions of the violation administrative fee payment structure payable to Xerox, and has instead retained those proceeds as surplus revenue for the agency's General Operating Fund.

171.   On its face, N.J.A.C § 19:9-9.2 violates N.J.S.A. § 27:23-34.3 insofar as the Authority did not update its Analysis of the Administrative Fee to reflect fluctuations over time of the actual cost of the Contractor's Share to ensure it remained reasonable and in line with the actual costs of collecting individual toll violations.

172.   On its face, N.J.A.C. § 19:9-9.2 violates N.J.S.A. § 27:23-34.3 insofar as an Administrative Fee of $50 is per se unreasonable when compared to the vast majority of other states, and even other roadway authorities and commissions within New Jersey, that charge administrative fees up to 25 times less than the NJTA charges.

173.   On its face, N.J.A.C. § 19:9-9.2 violates N.J.S.A. § 27:23-34.3 insofar as N.J.A.C. § 19:9-9.2 fails to offer: any grace period, any stepping of charges for

late payment of the toll, or any spreading of costs to habitual offenders.

174.   As applied, N.J.A.C. § 19:9-9.2 violates N.J.S.A. § 27:23-34.3 insofar as the NJTA falsely states in Violation notices that Individual Motorists must pay the Administrative Fee within 15 days (rather than the 30 days provided by N.J.S.A. § 27:23-34.3) to avoid incarceration, significant fines, suspension of vehicle registration, negative reporting to credit agencies and other liability and penalties.

175.   For all the foregoing reasons stated herein, N.J.A.C. § 19:9-9.2 violates N.J.S.A. § 27:23-34.3 and is therefore invalid on its face and as applied by NJTA to Plaintiffs and the Class Members.

**SECOND CAUSE OF ACTION:**
**42 U.S.C. § 1983**
**Violation of the Excessive Fines Clause of VIII Amendment to the U.S. Constitution**
**(As Against Defendants NJTA, NJ E-Z Pass, ABC Corporations 1-50, and all others in their Official Capacities on behalf of the 8th Amendment Class)**

176.   Plaintiffs repeat and re-allege each and every allegation contained above as though fully set forth herein.

177.   At all times relevant hereto, Defendants NJTA, NJ E-Z Pass, ABC Corporations 1-50 (collectively as, the "Corporate Defendants") were individuals and/or persons acting through their officials and agents, including but not limited to Defendants Mrozek, Hakim, Manuelli, and Jane and John Does 1-50

(collectively as, the "Official Defendants").

178.   At all times relevant hereto the Corporate Defendants and Official Defendants acted pursuant to, *inter alia*, N.J.S.A. § 27:23-34.3, and otherwise under color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of New Jersey.

179.   At all times relevant hereto, and as more particularly described throughout this Complaint, the Corporate Defendants and Official Defendants have patently abused the authority conferred upon them under N.J.S.A. § 27:23-34.3 by promulgating, implementing, and otherwise enforcing N.J.A.C. § 19:9-9.2, which includes a $50 Administrative Fee, against Plaintiffs and the 8th Amendment Class.

180.   The $50 Administrative Fee is excessive because it is grossly disproportionate to the amount of and severity of the underlying toll violation.

181.   Additionally, or in the alternative, the $50 Administrative Fee is excessive because it purports to be the basis for imprisonment of an Individual Motorist who fails to pay the violation in fifteen (15) days, whereas the statute provides for a minimum of thirty (30) days to comply the violation.

182.   Additionally, or in the alternative, the $50 Administrative Fee is excessive in so far as it was not established in conformity with N.J.S.A. § 27:23-34 and is at least twice the amount of the actual cost of collecting the toll violations.

183.   Additionally, or in the alternative, the $50 Administrative Fee is excessive when considered in the aggregate, after taking account of the fact that Plaintiffs and the 8th Amendment Class have been illegally compelled to tender an estimated $200,0000,000 to NJTA between the years 2011 and 2017.

184.   Using figures from the 2010 Analysis, the total purported costs of collection of $34,116,087 if properly divided up amongst an average of 10,000,000 violators (as required by N.J.S.A. § 27:23-34.3) would result in a true cost of only *$3.41 per violation.*

185.   As such, when compared against the assessed Administrative Fee of $50, each of the approximately 3,985,218 Individual Motorists (an average of 664,203 per year for the past 6 years) has been overcharged by at least $46.589, *for a total overcharge of at least $185,667,321.*

186.   Given that the Analysis improperly includes $15,751,075 in fees, all of which had been deleted from the Xerox Contract well before the new Administrate Fee went into effect, the actual cost per violation is $18.37 after removing the excess fees.

187.   As such, when compared against the assessed Administrative Fee of $50, each of the approximately 3,985,218 Individual Motorists (an average of 664,203 per year for the past 6 years) has been overcharged by at least $31.63 *for a total overcharge of at least $126,052,445.*

188.   As a direct and proximate result of the Individual Defendants' abuse of authority, Plaintiffs and the 8th Amendment Class have suffered a deprivation of their right to be free from the imposition of excessive fines as guaranteed to them under the VIII Amendment to the U.S. Constitution, which is hereby actionable pursuant to the Civil Rights Act, 42 U.S.C. § 1983.

189.   Accordingly, Plaintiffs and the 8th Amendment Class have suffered damages and/or are entitled to restitution in an amount to be proven at trial.

190.   Pursuant to 42 U.S.C. § 1988 Plaintiffs and the 8th Amendment Class further seek their costs and attorneys' fees incurred as a result of this lawsuit.

### THIRD CAUSE OF ACTION:
### 42 U.S.C. § 1983
### Violation of the Excessive Fines Clause of VIII Amendment to the U.S. Constitution
### (As Against Defendants Mrozek, Hakim, Manuelli, and Jane and John Does 1-50 in their Individual Capacities on behalf of the 8th Amendment Class)

191.   Plaintiffs repeat and re-allege each and every allegation contained above as though fully set forth herein.

192.   At all times relevant hereto, Defendants Mrozek, Hakim, Manuelli, and Jane and John Does 1-50 (collectively as, the "Individual Defendants) acted individually or in concert with one another.

193.   At all timers relevant hereto the Individual Defendants used their status as employees of NJTA, and by representing themselves as acting under color

of the laws , statutes, ordinances, regulations, policies, customs, and usages of the State of New Jersey, promulgate, implement, and otherwise enforce N.J.A.C. § 19:9-9.2, which includes an illegal $50 Administrative Fee, against Plaintiffs and the Class Members.

194.   The $50 Administrative Fee is excessive because it grossly disproportionate to the amount of and severity of the underlying toll violation.

195.   Additionally, or in the alternative, the $50 Administrative Fee is excessive because it purports to be the basis for imprisonment of an Individual Motorist who fails to pay the violation in fifteen (15) days, whereas the statute provides for a minimum of thirty (30) days to comply the violation.

196.   Additionally, or in the alternative, the $50 Administrative Fee is excessive in so far as it was not established in conformity with N.J.S.A. § 27:23-34 and is at least twice the amount of the actual cost of collecting the toll violations.

197.   Additionally, or in the alternative, the $50 Administrative Fee is excessive when considered in the aggregate, after taking account of the fact that Plaintiffs and the 8th Amendment Class have been illegally compelled to tender an estimated $200,0000,000 to NJTA between the years 2011 and 2017.

198.   Using figures from the 2010 Analysis, the total purported costs of collection of $34,116,087 if properly divided up amongst an average of 10,000,000

violators (as required by N.J.S.A. § 27:23-34.3) would result in a true cost of only *$3.41 per violation.*

199.   As such, when compared against the assessed Administrative Fee of $50, each of the approximately 3,985,218 Individual Motorists (an average of 664,203 per year for the past 6 years) has been overcharged by at least $46.589, *for a total overcharge of at least $185,667,321.*

200.   Given that the Analysis improperly includes $15,751,075 in fees, all of which had been deleted from the Xerox Contract well before the new Administrate Fee went into effect, the actual cost per violation is $18.37 after removing the excess fees.

201.   As such, when compared against the assessed Administrative Fee of $50, each of the approximately 3,985,218 Individual Motorists (an average of 664,203 per year for the past 6 years) has been overcharged by at least $31.63 *for a total overcharge of at least $126,052,445.*

202.   As a direct and proximate result of the Individual Defendants' abuse of authority, Plaintiffs and the 8th Amendment Class have suffered a deprivation of their right to be free from the imposition of excessive fines as guaranteed to them under the VIII Amendment to the U.S. Constitution, which is hereby actionable pursuant to the Civil Rights Act, 42 U.S.C. § 1983.

203.   Accordingly, Plaintiffs and the 8th Amendment Class have suffered damages and/or are entitled to restitution in an amount to be proven at trial.

204.   What is more, the Individual Defendants' actions were wanton, malicious, and oppressive and thus entitle Plaintiffs and the 8th Amendment Class are entitled to an award of punitive damages.

205.   Pursuant to 42 U.S.C. § 1988 Plaintiffs and the 8th Amendment Class further seek their costs and attorneys' fees incurred as a result of this lawsuit.

## FOURTH CAUSE OF ACTION:
### 15 U.S.C. § 1692 *et seq.*
### Violations of the Fair Debt Collection Practices Act
### (As Against Defendants NJTA as collection agent for NJ E-Z Pass and Defendants ABC Corporations 1-50, on behalf of the FDCPA Class)

206.   Plaintiffs repeat and re-allege each and every allegation contained above as though fully set forth herein.

207.   At all times relevant hereto, Defendants NJTA and Defendants ABC Corporations 1-50 (collectively as, the "Corporate Defendants") were individuals and/or persons acting through their officials and agents, including but not limited to Defendants Mrozek, Hakim, Manuelli, and Jane and John Does 1-50.

208.   At all times relevant hereto, the Corporate Defendants were entities separate and distinct from the State of New Jersey with their own differentiated

budget, operational policies, capacity to contract, and the capacity to sue and be sued.

209. At all times relevant hereto, the NJ E-Z Pass Defendant transacted with Plaintiffs and the FDCPA Class members pursuant to a consumer contract (the E-Z Pass Agreement) for the purchase of household goods and services (use of the Turnpike and the transponders).

210. At all times relevant hereto, the Corporate Defendants simultaneously acted as "debt collectors," as that term is defined in 15 U.S.C. § 1692a(6), in so far as they sent advisory and payment requests, a/k/a "Enforcement Notices," through the mails and other instrumentalities of interstate commerce, to the consumer Plaintiffs and the FDCPA Class Members, seeking to collect allegedly delinquent toll charges and Administrative Fees due to NJ E-Z Pass pursuant to the E-Z Pass Agreement .

### *Claims for Violation of 15 U.S.C § 1692e*

211. The Enforcement Notices were inherently misleading in several respects, and thus sent in violation of  15 U.S.C. § 1692e.

212. The Enforcement Notices sent to Plaintiffs and the FDCPA Class were inherently misleading in so far as they represented that legal proceedings had commenced even though no action at law has been initiated by the time the notice

is issued.

213.   The Enforcement Notices sent to Plaintiffs and the FDCPA Class were inherently misleading in so far as they threatened   "potential legal and administrative actions and damage to your credit rating" if the Administrative Fee and toll were not fully paid within 15 days of the date that the notice was sent whereas N.J.S.A. § 27:23-34.3(a) actually provides a 30-day deadline for payment of delinquent tolls and Administrative Fees.

214.   The Enforcement Notices sent to Plaintiffs and the FDCPA Class were inherently misleading in so far as they used ominous bold red lettering to threaten Plaintiffs and the FDCPA Class that "[n]on-payment of toll(s) is a violation and may be subject to credit bureau reporting" even though negative credit bureau reporting is not contemplated anywhere in the statute or regulation as an lawful enforcement mechanism.

### Claims for Violation of 15 U.S.C. § 1692f

215.   The Enforcement Notices sent to Plaintiffs and the FDCPA Class constitute violations of 15 U.S.C. § 1692f in so far as they are an unfair and unconscionable means of attempting to collect or actually collecting a debt.

216.   In particular, the Enforcement Notices constitute violations of § 1962f(1) because they seeks to collect a $50 Administrative Fee which is not

properly authorized under N.J.S.A. § 27:23-34.3.

217.   Moreover, the Enforcement Notices constitute violations of § 1962f in so far as they prematurely threaten to take non-judicial action to dispossess Plaintiffs and the FDCPA Class of their property:   "[n]on-payment of toll(s) is a violation and may be subject to credit bureau reporting and the suspension of motor vehicle registration by the New Jersey Motor Vehicle Commission," where the statutorily permitted 30 day period for settling the debt has not lapsed and the Corporate Defendants have no present legal authority to interfere with Plaintiffs' and the FDCPA Class' vehicles.

### Claims for Violation of § 1692g

218.   The Enforcement Notices sent to Plaintiffs and the FDCPA Class constitute violations of 15 U.S.C. § 1692g in so far as they do not include any of the required disclosures enumerated in § 1692g(a)(1) though (a)(5) and because, upon information and belief, the Corporate Defendants did not otherwise send Plaintiffs and the FDCPA Class members a subsequent notice including these disclosures within 5 days of the initial Enforcement Notice.

219.   The Corporate Defendants violations of the Fair Debt Collection Practices Act entitle Plaintiffs and the FDCPA Class to their actual damages for their § 1692e and § 1692f claims in an amount to be proven at trial, statutory

damages for their § 1692g claims, and court costs and attorney's fees incurred as a result of this lawsuit, all pursuant to § 15 U.S.C. § 1692k.

### FIFTH CAUSE OF ACTION:

**Unjust Enrichment/Disgorgement – Creation of a Common Fund**
**(As Against Defendants NJTA, NJ E-Z Pass, and ABC Corporations 1-50)**

220.   Plaintiffs repeat and re-allege each and every allegation contained above as though fully set forth herein.

221.   Plaintiffs and the Class Members assert a common law claim for unjust enrichment.

222.   By means of the NJTA's wrongful conduct alleged herein, NJTA knowingly assessed charges on Plaintiffs that were unfair, unconscionable, oppressive, and in violation of New Jersey law.

223.   The NJTA knowingly received and retained wrongful benefits and funds from Plaintiffs and all other individual motorists who have paid a $50 Administrative Fee since October of 2011.  In so doing, the NJTA acted with conscious disregard for the rights of Plaintiffs and each of these Individual Motorists.

224.   As a result of the NJTA's wrongful conduct as alleged herein, the NJTA has been unjustly enriched at the expense of, and to the detriment of,

Plaintiffs and each of the Individual Motorists.

225.   The NJTA's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

226.   It is inequitable for the NJTA to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of unconscionable and illegal fees on Plaintiffs and each of the Individual Motorists in an unfair, unconscionable, and oppressive manner. The NJTA's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

227.   The financial benefits derived by the NJTA rightfully belong to Plaintiffs and each of the Individual Motorists.   Accordingly, NJTA should be compelled to disgorge in a common fund for the benefit of Plaintiffs and each of the Individual Motorists all wrongful or inequitable proceeds received by it.

228.   A constructive trust should also be imposed upon all wrongful or inequitable sums received by the NJTA traceable to Plaintiffs and each of the Individual Motorists.

229.   Plaintiffs and each of the Individual Motorists have no adequate remedy at law.

230.   There is no basis in law and it is legally indefensible for the NJTA to

retain any of the $50 Administrative Fees collected beginning in October of 2011 and continuing through the present day, all such fees having been assessed and collected in violation of N.J.S.A. § 27:23-34.3.

231.   Basic principles of honesty, fairness and equity mandate the refund of any excess in the Administrative Fees above what is reasonable, which shall be proven at trial, collected beginning in October of 2011 and continuing through the present day.

232.   If NJTA were not required to refund all excess Administrative Fees collected beginning in October of 2011 and continuing through the present day, the NJTA would be unjustly enriched.

233.   The NJTA does not have a particle of right to the excess of Administrative Fees beyond what is reasonable, collected beginning in October of 2011 and continuing through the present day, all such fees are due to Plaintiffs and the Class Members according to principles of common honesty.

### SIXTH CAUSE OF ACTION:
### Rescission of Contract for Illegality
### (As Against Defendants NJTA d/b/a NJ E-Z Pass and Defendants ABC Corporations 1-50)

234.   Plaintiffs repeat and re-allege each and every allegation contained above as though fully set forth herein.

235.   Plaintiffs and the Class Members assert a common law claim for breach of contract.

236.   Plaintiffs and the Class Members did enter into a contract in the form of the E-Z Pass Agreement with the Corporate Defendants.

237.   Said contract contains a unilateral mistake in so far as it purports to collect an illegal $50 Administrative Fee, impermissible under N.J.S.A. § 27:23-34.3.

238.   The E-Z Pass Agreement is thus null and void as it relates to Plaintiffs' and the Class Members' obligation to pay a $50 Administrative Fee.

239.   By operation of law the E-Z Pass Agreement must be rescinded and all amounts paid to the Corporate Defendants must be returned to Plaintiffs and the Class Members.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and all other similarly situated, pray for a judgment against Defendant as follows:

1. For an order certifying the Class, pursuant to Rule 23, appointing Plaintiffs as representatives of the Class, and appointing the law firms representing Plaintiffs as counsel for the Class;

2. A declaration that N.J.A.C. § 19:9-9.2 violates N.J.S.A. § 27:23-34.3 and

is therefore invalid on its face and as applied by the NJTA pursuant to 28 U.S.C. § 2201;

3. A declaration that N.J.A.C. § 19:9-9.2 be revised to reflect a reasonable Administrative Fee based upon the actual cost of processing and collecting individual violations pursuant to 28 U.S.C. § 2201;

4. An Order requiring a refund to the 8th Amendment Class of all Administrative Fees illegally collected from October 17, 2011 through the present date, currently estimated to be $199,260,900;

5. An Order requiring restitution of all Administrative Fees collected from Plaintiffs and the 8th Amendment Class between October 17, 2011 through the present date, currently estimated to be $199,260,900;

6. An Order requiring a partial refund to the Plaintiffs and the 8th Amendment Class of the difference between all Administrative Fees collected from October 17, 2011 through the present date, and the fees that would have accrued had the NJTA assessed a reasonable charge based on the actual cost of processing and collecting the individual toll Violation;

7. An Order requiring a partial refund to the Plaintiffs and 8th Amendment Class of the difference between all Administrative Fees collected from

October 17, 2011 through the present date, and the fees that would have accrued had the NJTA continued to apply a $25 charge, currently estimated to be $99,630,450;

8. An Order requiring disgorgement of all of the ill-gotten gains derived by the NJTA and NJ E-Z Pass from its aforementioned misconduct into a common fund for the benefit of Plaintiffs and the Class Members;

9. An award of pre-judgement interest at the maximum rate permitted by applicable law;

10. An award of the costs incurred in pursuing this action, including, but not limited to, reasonable attorney's fees pursuant to applicable law, contract, and/or equitable principles; and

11. Such other relief as deemed just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all claims so triable.

## **CERTIFICATION OF OTHER PENDING ACTIONS**

There is currently an administrative "Petition for Rule Change, Refund/Disgorgement and Cause of Action for Unjust Enrichment" pending appeal before the Appellate Division of the Superior Court of New Jersey predicated on facts similar to those at issue in this action. Pursuant to L.Civ.R. 11.2, Plainitffs

hereby certify that to the best of their knowledge the aforementioned case is the only other similar action pending in any other courts or jurisdictions.

**Royer Cooper Cohen Braunfeld LLC**

By: _____

*Of Counsel:*

Pogust Braslow & Millrood, LLC
Harris L. Pogust, Esquire
Eight Tower Bridge, Suite 940
161 Washington Street
Conshohocken, PA 19428
T: (610) 941-4204 ext. 105
F: (610) 941-4245

Matthew Faranda-Diedrich, Esquire
NJ Id. No. 017392006
mfd@rccblaw.com
Two Logan Square
100 N. 18th St., Suite 710
Philadelphia, PA 19103
T: (215) 839-1000
F: (484) 362-2630

Dated:  December 1, 2017

## DESIGNATION OF TRIAL COUNSEL

Plaintiffs hereby designate Matthew Faranda-Diedrich, Esquire as trial counsel.

Respectfully Submitted,

Royer Cooper Cohen Braunfeld LLC

By: _____

Matthew Faranda-Diedrich, Esquire
mfd@rccblaw.com
Two Logan Square
100 N. 18th St., Suite 710
Philadelphia, PA 19103
T: (215) 839-1000
F: (484) 362-2630

Dated:  December 1, 2017